**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| JUVY MACAHITO ROJO,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>ROSALIA KAPILEO-IGISAIAR, et al.,<br><br>　　　　　　　Defendants. | Case No. 1:12-CV-00024<br><br>**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

This dispute regards Defendants' allegedly unconstitutional acts, and today the Court determines whether Defendants plausibly lack qualified immunity from Plaintiff's civil rights claims (ECF No. 9). Defendants primarily argue that they possess qualified immunity because Commonwealth of the Northern Mariana Islands ("Commonwealth") law authorized their actions. The Court disagrees, and it DENIES in part and GRANTS in part the motion to dismiss.

### I.　BACKGROUND

In August 2010, Plaintiff Juvy Rojo ("Rojo") planned to open a catering business, which she would operate out of her home. (ECF No. 1 at ¶¶ 4, 10 (hereinafter "Complaint").) Despite not yet operating the business, two Commonwealth Department of Public Health, Bureau of Environmental Health ("Health Bureau") inspectors ordered her to cease operating. (*Id.* at ¶ 10.) One of those inspectors was Defendant Lau Laniyo ("Laniyo"). (*Id.* at ¶ 10.) The inspectors did not afford her a hearing to contest this order. (*See id.*)

1

Soon after, in September, Rojo continued preparing to open a catering business. (*See id.* at ¶ 11.) She requested a Health Bureau inspection. (*Id.*) A successful inspection results in obtaining a sanitation permit, which is a prerequisite for legally operating a catering business. (*Id.*) The day after making this request, Defendant Rosalia Kapileo-Igisaiar ("Kapileo"), a Health Bureau employee, "banged" on the door of Rojo's home at 7:30 a.m. (*See id.* at ¶¶ 5, 13.) Kapileo yelled the words, "I know you are cooking in there," or words of similar effect. (*See id.* at ¶ 13.) At the time, Rojo was preparing a meal for the workers repairing her mother's house, which was next door. (*Id.* at ¶ 12.) Rojo's sister was also in the kitchen, but she was not cooking. (*Id.*)

Rojo opened the door, and Kapileo "barged into the kitchen without asking permission and began barking penalties at [Rojo and her sister]." (*Id.* at ¶ 13.) Rojo explained that she was only cooking "for the workers at her mother's house" and not for a catering business. (*See id.*) Kapileo "responded that she did not want their 'BS' and fined them a total of $1,500." (*Id.*)

After issuing the fines, Kapileo began confiscating Rojo's property. To proceed with this mission, Kapileo obtained trash bags from Rojo. (*Id.* at ¶ 14.) Kapileo then used those trash bags "to empty the contents of two refrigerators and a freezer," along with the food Rojo was currently preparing. (*Id.*) Kapileo also confiscated "a 20 quart pressure cooker, a small pot and plastic bowls, kitchen containers for food, [a] frying pan, [a] strainer, [a] gas burner, and other items." (*Id.*)

At some point during or after this process, Kapileo called Health Bureau inspectors Defendants Mel Ngirausui ("Ngirausui") and Laniyo for assistance. (*See id.* at ¶ 15.) They fined Rojo $500 for lacking a sanitation permit and $1,000 for two people cooking without food handling certificates. (*Id.*) All three Defendants then left Rojo's home "with four trash bags filled with [Rojo's] proper[t]y," which they then disposed of at least some of this property at the

2

Commonwealth landfill. (*Id.* at ¶ 18.) This amounted to all Rojo's personal food. (*See id.*) For a week, Rojo had to rely on her family for sustenance. (*See id.*)

This incident was a law enforcement raid. Defendants were not there to conduct a sanitary permit inspection, and at no point did they conduct one. (*Id.* at ¶ 15.) Nor did they provide her with any hearing to contest the seizure, confiscation, or destruction of her property. (*Id.* at ¶ 16.)

Rojo complained to Kapileo's superior, Defendant John Tagabuel ("Tagabuel"). (*Id.* at ¶ 20.) Tagabuel insisted Kapileo acted properly, and Tagabuel did not advise her of any right to a hearing to contest the penalties and seizures. (*Id.*)

After all this, Rojo still wished to operate a catering business, but Kapileo and Tagabuel insisted that she pay her fines before they would process her application. (*See id.* at ¶ 21.) In October, she paid $225 towards those fines, and the Health Bureau inspected her facilities and issued her permit. (*Id.*)

In January 2011, five months after the incident at Rojo's home, Kapileo and Tagabuel ordered Rojo's business closed for not paying her fines. (*Id.* at ¶ 22.) Around this same time, Rojo discovered that not all her property was destroyed from the Health Bureau raid. She found her pressure cooker in Kapileo's office. (*Id.* at ¶ 19.) She requested its return, and Kapileo obliged. (*Id.*)

Five months after Kapileo and Tagabuel ordered Rojo's business closed, Rojo wished to open a new catering business and submitted a new application to the Health Bureau. (*See id.* at ¶¶ 22–24.) Kapileo and Tagabuel refused to process her application until she paid the previously issued fines. (*Id.* at ¶ 24.)

Rojo now alleges four claims; all are made under 42 U.S.C. § 1983. (*See id.* at ¶ 28 n.1.) Only the first three claims are at issue on this motion to dismiss, all three of which are against Defendants in their individual capacities. Those three claims are: (1) all Defendants violated her

3

procedural and substantive due process rights by seizing and destroying her property (*id.* at ¶¶ 26–29); (2) all Defendants violated her Fourth Amendment rights (*id.* at ¶¶ 30–33); and (3) Kapileo and Tagabuel violated her procedural and substantive due process rights by refusing to process her new catering business application (*id.* at ¶¶ 34–38).

## II.  JURISDICTION

This Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1343 (federal question and civil rights jurisdiction, respectively).

## III.  STANDARD

To survive a motion to dismiss under Rule 12 (b)(6) of the Federal Rules of Civil Procedure, the complaint must allege "sufficient facts to raise" a plaintiff's "right to relief above the speculative level." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). It must make the right to relief plausible. *Twombly*, 550 U.S. at 557. All allegations must be assumed true, *id.* at 555–56, but legal conclusions need not be, *Iqbal*, 556 U.S. at 678. The factual allegations must "give fair notice and . . . enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012). Factual allegations also "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* Finally, a court "must construe the complaint in the light most favorable to the plaintiff," *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005), including by "draw[ing] . . . reasonable inference[s]" from the complaint, *Iqbal*, 556 U.S. at 678.

/

4

## IV. DISCUSSION

The motion seeks to dismiss the three claims that (1) all Defendants unconstitutionally confiscated Rojo's property, (2) all Defendants unconstitutionally searched Rojo's property, and (3) Kapileo and Tagabuel unconstitutionally cited Rojo and unconstitutionally withheld official action. Defendants also raise a question regarding the proper scope of review on a motion to dismiss. The Court first analyzes the proper scope, then reviews qualified immunity law, and then analyzes each dismissal basis in turn.

### A. EXTERNAL REPORTS & MOTION TO DISMISS

Defendants urge this Court to consider several of Defendant's law enforcement reports, as permitted by *Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006). (*See, e.g.*, ECF No. 14 at 1–2 (hereinafter "Reply").) They believe these reports show that Kapileo "was conducting a lawful pre-operational inspection . . . ." (ECF No. 10 at 7 (hereinafter "Motion").)

Under *Marder*, courts may consider documents external to the complaint on a motion to dismiss where: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448. A document is central to a plaintiff's claim where the claim's allegations are based on that document's contents. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *superseded by statute on other grounds*.

Rojo's claims are not based on the law enforcement reports. Her claims are based on Defendants' conduct, not Defendants' subsequent reports on their conduct. Therefore, the Court cannot consider these documents. Even if the Court could consider them, they plausibly support Rojo's claims that Defendants were there on a law enforcement mission and not an administrative

inspection. (*See* ECF Nos. 10-2, 10-3 (checking "Complaint" box as the reason for their action, and not the "Pre-operation" or "New Permit" box)).

## B. QUALIFIED IMMUNITY FRAMEWORK

Qualified immunity shields "government officials performing discretionary functions . . . [from] civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When considering a question of qualified immunity on a motion to dismiss, a court must accept the complaint's factual allegations as true. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). To survive the motion, a plaintiff must plausibly "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 2080. The latter showing "turns on the 'objective legal reasonableness' of the action" and whether "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Inouye v. Kemna*, 504 F.3d 705, 712 n.6 (9th Cir. 1997) (explaining that this reasonableness inquiry is part of the second showing). This reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Before applying this test, a court must define the alleged right more particularly than the constitutional provision itself, but it need not incorporate all the factual circumstances in the alleged right. *See Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995) (defining the right as an Eighth Amendment right generally is likely insufficient, but defining it as "Eighth Amendment rights in the prison medical context" is sufficiently particular (emphasis removed)).

/

6

### C. FIRST CAUSE OF ACTION: UNLAWFUL SEIZURE

The first claim alleges, among other things, procedural and substantive due process violations against Kapileo, Ngirausui, Laniyo, and Tagabuel for their unlawful seizure of Rojo's property. (Complaint at ¶¶ 26–27.) It alleges that the former three personally committed these violations and that Tagabuel both ratified and acted with deliberate indifference in respect to these violations. (*Id.*)

Defendants argue that these claims should be dismissed because the seizure was authorized by Commonwealth statute. (Motion at 4.) They also argue that the claims against Ngirausui and Laniyo should be dismissed because of their peripheral role. (Reply at 5.) Thus, they implicitly concede that Tagabuel's role—one of ratifying and deliberate indifference—does not provide a separate basis for dismissal.

#### 1. Procedural Due Process

"Procedural due process claims require (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003). Whether the procedural safeguard is required before or after the deprivation depends on three factors, *see Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), but usually due process "requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis omitted).

##### a. Violation

Constitutionally protected property interests include ownership of chattel. *See, e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571–72 (1972). Rojo plausibly pleads that she owned the seized cookware and foods (*see* Complaint at ¶¶ 14–15, 18, 28), so she has a constitutionally protected interest.

7

As for the second element, Rojo pleads that there was never any hearing on the seizure of goods. (*Id.* at ¶ 16.) The Court, therefore, need not query what procedures were required and when, because she received none.

The two Commonwealth statutes authorizing seizure of food do not provide procedural safeguards to the person whose food was seized. The Pure Food and Drug Act authorizes an inspector to "[s]eize and detain for such time as may be necessary any article . . . which the inspector believes on reasonable grounds any provision of this chapter or any regulations promulgated thereunder has been contravened." 3 CMC § 2771(c)(5). The act authorizes the inspector to seize the goods indefinitely. *See id.* § 2779 ("Any article seized under this article may, at the option of an inspector, be kept or stored in the building or place where it was seized or, at the direction of an inspector, the article may be removed to any other place."); *id.* § 2780 ("An inspector who has seized any article under this article shall release it when he or she is satisfied that all the provisions of this chapter and the regulations with respect thereto have been complied with."). The statute does not provide any procedures for contesting this seizure, but it does provide procedures enabling the Commonwealth to make the indefinite seizure permanent. *See id.* § 2783 (authorizing an inspector to initiate judicial proceedings to terminate a person's rights to the seized goods); *see also id.* § 2788 (authorizing the Commonwealth to initiate a trial against the person for violating the act).

Additionally, regulations promulgated under the Commonwealth Environmental Health and Sanitation Act (hereinafter "Sanitation Act") authorize seizure of "unwholesome foods." NMIAC § 140-20.7-834(b)–(c). Yet the regulations do not provide any right of hearing to contest this seizure. *See* NMIAC § 140-20.7-834; *see generally id.* § 140-20.7. Nor does the authoritative statute. *See* 3 CMC § 2143 (providing right of hearing for fines only).

Pursuant to these laws, Defendants seized Rojo's food and cookware. Despite Rojo's protestations of this seizure, Defendants neither provided her a hearing nor advised her of any potential right to a hearing. (Complaint at ¶¶ 16, 20.) Because Commonwealth law does not provide for a hearing and because Defendants did not provide her a hearing, Defendants violated her procedural due process rights.

### b. Qualified Immunity

Defendants contend that a state officer's compliance with a state law grants that officer qualified immunity. (*See* Motion at 8.) It does not. Compliance with a state statute is generally irrelevant to the questions of both whether there is a constitutional violation and whether an officer possesses qualified immunity for that violation. *See, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 194–95 (1984); *Case v. Kitsap Cnty. Sheriff's Dept.*, 249 F.3d 921, 929 (9th Cir. 2001); *see also De Nieva v. Reyes*, CIV. A. No. 88–00017, 1989 WL 158912, *9 (D. N. Mar. I. Oct. 19, 1989). What matters is whether there was a clear violation of federal law. *See, e.g.*, *Davis*, 468 U.S. at 194–95; *Case*, 249 F.3d at 929. If there is, relying on a state statute violating the Constitution does not provide qualified immunity, because a reasonable officer in that person's position would know there is a clearly established constitutional right and that the statute violates it. *E.g.*, *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 882 (9th Cir. 2002).

Such is the case with procedural due process. A reasonable inspector would know that confiscating property would require at least some hearing. *See, e.g.*, *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40 (1st Cir. 2007) (stating that a Puerto Rico statute "provid[ing] for the suspension of a professional license before a hearing is provided, without limitation," was patently unconstitutional under federal law and that defendants could not use it as a basis for qualified immunity because, among other reasons, "a reasonable official in their position would have

9

known that it violates the Due Process Clause"). Accordingly, Defendants plausibly lack qualified immunity.

### 2. Substantive Due Process

A person possesses a substantive due process right to be free of arbitrary executive abuses of power. *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1988). This right is violated where a government official's act shock the conscience. *Id.* at 846–47. Conscience shocking behavior includes government officers abusing their power, such as by using it "as an instrument of oppression . . . ." *Id.* at 846 (internal quotations omitted).

Determining what is and is not conscience shocking "demands an exact analysis of circumstances" and can include an official's "deliberate indifference." *Id.* at 850. Often, whether an act shocks the conscience depends on the actor's intent. *See, e.g.*, *Bingue v. Prunchak*, 512 F.3d 1169, 1170–71 (9th Cir. 1999) (holding that a police officer's injuring a bystander during a high-speed chase violates that bystander's substantive due process rights only where the officer "deliberately inten[ded]" to cause her harm); *see also Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 594 (3d Cir. 1998) (holding that an *ultra vires* act "is not sufficient in itself to establish a substantive due process claim" and that what matters is the government official's motives in undertaking that act). For these reasons, a food inspector's unwise mistake of judgment does not shock the conscience where that inspector had the discretion to make the judgment and made it "in accord with his responsibility for protecting public health." *Camuglia v. City of Albuquerque*, 375 F. Supp. 2d 1299, 1309–10 (D.N.M. 2005).

### a. Violation

Defendants plausibly violated Rojo's substantive due process rights by abusing their confiscatory powers in two ways. First, they abused their powers by confiscating Rojo's cookware. Under Commonwealth law, food inspectors lack any power to confiscate non-food items. Their confiscatory powers are limited exclusively to unsafe or unsanitary food. *See* 3 CMC §§ 2711, 2717, 2771(c)(5), 2779; NMIAC § 140-20.7-834(b)–(c). This limitation is sensible, as cookware usually is not the reason why food is unsafe or unsanitary.

Defendants similarly abused their powers in confiscating Rojo's food. Two Commonwealth laws grant food inspectors the power to confiscate food for various reasons. The Pure Food and Drug Act allows food to be seized only where the food is both for sale and: is "unfit for human consumption;" "[c]onsists in whole or in part of any filthy, putrid, disgusting, rotten, decomposed or diseased animal or vegetable substance;" or "[w]as manufactured, prepared, preserved, packaged, distributed, or stored under unsanitary conditions." *See* 3 CMC §§ 2711, 2717, 2771(c)(5), 2779. Additionally, regulations under the Sanitation Act allow confiscating a restaurant's food where it is "unwholesome." NMIAC § 140-20.7-834(b)–(c). The regulations do not define unwholesome, but it cannot be defined as merely unhealthy.

Defendants lacked statutory authority here. The food was not for sale (*see* Complaint at ¶ 13), and nothing in the complaint indicates that it was unfit for consumption or otherwise unwholesome.

Besides lacking any statutory basis, it plausibly appears the inspectors also lacked any legitimate aim. With the cookware, the complaint does not indicate any reason why it would have made food unsafe or unsanitary. And with the food, nothing in the complaint would allow a food inspector to reasonably conclude that it was unsafe or unwholesome, especially for the food found in

11

Rojo's refrigerators and freezer. Thus, lacking any legitimate reason for confiscation, Defendants plausibly acted for illegitimate reasons, like animus or oppression, and not out of concern for public health. This abuse of their official powers plausibly shocks the conscience.

Defendants advance two arguments why Defendants were authorized to seize Rojo's food. First, they argue that this food was prepared in unsanitary conditions. (Motion at 8; Reply at 3.) They do not, however, point to any portion of the complaint supporting this conclusion. Instead, they appear to argue that lacking a sanitary permit, business license, or food handling certificate is sufficient for confiscation. (*See* Motion at 8–9; Reply at 3.) But this is not sufficient. Lacking licenses or permits may be a sufficient basis for issuing fines, but Commonwealth law does not list this as a basis for confiscating food.

Second, Defendants argue that the food was "unwholesome." (Motion at 8–9.) But again, they point to no allegations in the complaint supporting such a determination.

### b. Qualified Immunity

The right to be free from arbitrary abuses of executive authority undertaken out of animus and not for protecting public health is clearly established. *See Lewis*, 523 U.S. at 845–47. This right is sufficiently particular for qualified immunity analysis because it does not just describe the substantive due process right generally, but also incorporates the specific manner that it is violated.

Of course, one could define the right more narrowly as the right to be free of a food inspector abusing his confiscatory powers. Defined as such, no published case has recognized these acts as violating substantive due process, and therefore, this right would not be clearly established.

The Court need not define the right this narrowly for two reasons. First, substantive due process is the right to be free of "arbitrary executive action," and it is "intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression."

12

*Id.* at 843, 846–47 (internal quotation marks removed). Thus, it is clearly established that all government officers—whether a police officer or food inspector—are subject to this minimal constraint. Reasonable food inspectors, as government officials, should know that they cannot abuse their confiscatory powers for the purpose of oppressing or harassing a person. *Cf. Camuglia*, 375 F. Supp. 2d at 1310 (finding a government restaurant inspector was entitled to qualified immunity where he acted out of concern for public safety).

Second, the right also does not require more precise defining because the proffered definition adequately achieves qualified immunity's policy aims. Qualified immunity is intended to prevent the fear of personal liability from unduly inhibiting government officials in discharging their duties. *Anderson*, 483 U.S. at 638. To accomplish this aim, qualified immunity bars suits against government officials where the acts are objectively reasonable. *See id.* Thus, even where the factual circumstances are novel, a government official lacks qualified immunity where a reasonable officer would know her "conduct violates established law . . . ." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Here, a reasonable food inspector would know that abusing her confiscatory powers with the aim of oppressing a person, and not protecting public health, violates substantive due process.

Defendants contend that Laniyo and Ngirausui have qualified immunity because their role in the confiscation was periphery and, hence, objectively reasonable. (Reply at 5.) They assert that, under *United States v. Hensley*, 479 U.S. 221, 230–33 (1985), law enforcement "officers are not required to second guess a fellow officer's determination of reasonability or probable cause." (Reply at 5; *see also* Motion at 9.)

Defendants misread and misapply *Hensley*. It does not grant qualified immunity anytime a law enforcement officers relies on another officer's determination. Rather, it grants qualified

immunity only where an officer can "justifiably" and in "good-faith" rely on that other officer's determination. *See* 479 U.S. at 232–33.

If Laniyo and Ngirausui knew they were confiscating cookware, they could not justifiably and in good faith rely on Kapileo's determination because Commonwealth law does not permit that confiscation. Such knowledge is plausible. From the complaint, it appears that Kapileo confiscated all the property and "then called" Laniyo and Ngirausui. (*See* Complaint at 14–15.) The latter two assisted in removing the property, which was stowed in trash bags. (*See id.* at ¶ 18.) A 20 quart pressure cooker is large, and assuming it even capable of being carried in a trash bag, its presence would be obvious to anyone carrying or assisting carry those bags.

### D. SECOND CAUSE OF ACTION: FOURTH AMENDMENT

The second cause of action alleges Defendants violated Rojo's Fourth Amendment rights by nonconsensually entering her home without a warrant. Generally, searching one's home requires either consent or a warrant. *See See v. City of Seattle*, 387 U.S. 541, 545 (1967). Defendants contend this case falls into an exception to this requirement, for persons operating in a pervasively regulated industry. (Motion at 10.) Alternatively, Defendants contend Rojo consented to the search. (*Id.*) Again, Defendants argue that this claim against Ngirausui and Laniyo should be dismissed because of their peripheral role. (Reply at 6–7.) Thus, they implicitly concede that Tagabuel's role—one of ratifying and deliberate indifference—does not provide a separate basis for dismissal.

#### 1. Violation

The pervasively regulated industry exception does not apply here. In pervasively regulated industries, the government may conduct warrantless "administrative searches" where "the statute's inspection program, in terms of the certainty and regularity of its application, provides a

14

constitutionally adequate substitute for a warrant." *Rush v. Obledo*, 756 F.2d 713, 718–20 (9th Cir. 1985). An adequate substitute essentially requires that the regulatory framework place the industry on notice that inspectors will be conducting inspections without warrants. *See id.* at 718–21.

The Court assumes that Rojo was operating in the industry by virtue of her application. Even with this assumption, Rojo was not placed on notice of the possibility of warrantless inspections of her home because the Commonwealth regulatory framework forbids warrantless, nonconsensual searches of homes. 3 CMC § 2772 (expressly forbidding warrantless searches for "dwelling-houses"); *see id.* § 2128 (implicitly forbidding warrantless searches of all establishments).

Second, Rojo plausibly did not consent to the search. Rojo opened the door in response to Kapileo's censure, and Kapileo then "barged into the kitchen without asking permission and began barking penalties at [Rojo]." (Complaint at ¶ 13.) Kapileo then proceeded to confiscate Rojo's property. (*Id.* at ¶ 14.) The complaint does not discuss how Rojo reacted to Kapileo's intrusions, but construing the complaint in the light most favorable to Rojo requires the Court to assume she did not indicate assent.

Defendants argue that there was consent because Rojo never "made any overt statement or gesture communicating a lack of consent." For support, they cite to a case where the inspectee consented casually by stating " 'Go ahead' or words of similar import." *See United States v. Thriftimart, Inc.*, 429 F.2d 1006, 1008–09 (9th Cir. 1970); (Motion at 11–12). But nothing in the complaint indicates that Rojo uttered such words, and this does not construe the complaint in the light most favorable to Rojo.

In sum, the Fourth Amendment required either a warrant or Rojo's consent for Defendants' entry. Defendants had neither. Thus, they plausibly violated Rojo's Fourth Amendment rights.

/

15

### 2. Qualified Immunity

The right to be free of nonconsensual searches of one's home where the officer lacks a warrant is clearly established. *See City of Seattle*, 387 U.S. at 545. Thus, a reasonable officer would know that such a search requires consent. Based on the allegations in the complaint, a reasonable officer could not conclude Rojo consented. Accordingly, Kapileo and Tagabuel plausibly lack qualified immunity.

However, Laniyo and Ngirausui do not plausibly lack qualified immunity. (Reply at 6–7.) They arrived at the scene after receiving a call from Kapileo. (*See* Complaint at ¶¶ 13–15.) Under *Hensley*, they need not second guess Kapileo's initial entry and could justifiably believe that Kapileo had entered with Rojo's consent or a warrant. Though it is possible that they knew Kapileo had entered Rojo's home unlawfully, the complaint alleges no facts making this conclusion plausible.

### E. THIRD CAUSE OF ACTION: FINES & WITHHOLDING ACTION

The third cause of action alleges, among other things, that Kapileo and Tagabuel violated Rojo's procedural and substantive due process rights by withholding official action on her sanitary permit application and by denying her a hearing on the imposed fines. (*See* Complaint at ¶¶ 35–37.)

### 1. Procedural Due Process

Procedural due process requires "adequate notice and an opportunity to be heard." *E.g.*, *Kirk v. United States Immigration and Naturalization Serv.*, 927 F.2d 1106, 1107 (9th Cir. 1991); *Kildare*, 325 F.3d at 1085. With a fine, adequate notice must be "reasonably calculated" to inform persons of their "opportunity to present objections." *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 14 (1978). Thus, if the notice provided on a bill or fine provides only that the deprivation will occur "if payment [is] not made by a certain date" but does not advise the person "of

the availability of a procedure for protesting," that notice "does not comport with constitutional requirements." *See id.* at 13–15; *see also Horn v. City of Chicago*, 860 F.2d 700, 704–05 (7th Cir. 1988) (holding that demand letters for outstanding parking tickets provide sufficient notice because, among other reasons, the initial parking ticket apprised persons of their right to contest the ticket in court). The right is limited to situations where there is "some factual dispute . . . ." *See Codd v. Velger*, 429 U.S. 624, 627 (1977) (per curiam) (internal quotation marks removed).

Kapileo and Tagabuel plausibly violated Rojo's procedural due process rights. Rojo complained about the penalties' impropriety to Tagabuel. (*See id.* at ¶ 20.) Despite her complaints, Kapileo and Tagabuel did not advise Rojo of her right to a hearing on these fines and insisted that she pay them. (*See* Complaint at ¶¶ 20–21.) Nor did the report imposing the fines plausibly notify Rojo of a right to hearing. (*See id.*; *cf.* ECF No. 10-3 (directing "Management to clear imposed penalties 1st").) Thus, there is a factual dispute regarding the fines, and Kapileo and Tagabuel did not notify her of her right to a hearing.

Kapileo and Tagabuel plausibly lack qualified immunity. It is clearly established that issuing a fine requires providing notice of a hearing. *See Memphis Light, Gas and Water Div.*, 436 U.S. at 14. A reasonable officer would be aware of Rojo's due process right to a hearing and the requirement to notify her of it. Despite the Commonwealth's contentions (Motion at 16), the fine's proper assessment under Commonwealth law is irrelevant. *See supra* at 9.

### 2. Substantive Due Process

A government official violates a person's substantive due process rights when the former's acts shock the conscience. *See supra* at 10. Here, Tagabuel and Kapileo's acts plausibly do. The latter illegally entered Rojo's home and illegally confiscated and destroyed her property. Tagabuel

ratified this conduct. When Rojo complained to Tagabuel, he insisted that Kapileo acted properly. (Complaint at ¶ 17.) Both Kapileo and Tagabuel refused to provide her a hearing to contest the fines. They then used these unconstitutional fines as a basis for withholding a sanitary permit and to extract payment from Rojo. (*Id.* at ¶ 24.) It plausibly appears they are abusing their law enforcement power to oppress Rojo. A reasonable official would know such acts violate her clearly established right to be free of such oppression.

## V.  CONCLUSION

For these reasons, Defendants' motion to dismiss is granted in part, and denied in part. The Court grants the motion as to Laniyo and Ngirausui on the second cause of action. Finding they possess qualified immunity, the Court dismisses Laniyo and Ngirausui from the second cause of action. Rojo is granted leave to amend her complaint. The motion is denied as to all Defendants for all other claims.

SO ORDERED this 24th day of June, 2013.

/s/ Ramona V. Manglona
RAMONA V. MANGLONA
Chief Judge